3-24-4-0-2-9-8 Global Research Distribution, Inc. Appellant Cross Appellee v. One Stop Mailing, LLC, doing business as OSM Worldwide Appellee Cross Appellant. Mr. Millis, if you're ready to proceed. I am ready to proceed, Your Honor. Thank you. I'm Paul Millis from Meyers-Swass English & Kline in Garden City, New York, admitted pro hofice in this case. I am here for my client, Global Research Distribution. Your Honor, I see this is very fairly, it should be very straightforward. We have three claims that we've made in a complaint, an amended complaint because the court needed some further information, and I believe we obliged. I had faith in the first complaint, but of course, we do what the court tells us to do. So, what we have here, Your Honor, is an absolute, absolute contract between these parties, an implied and fact contract, whereby they were tested, they were engaged for the purpose of delivering very time-sensitive information. These are not people who are new to this business. This is not their first rodeo. That's why my client went to them, because we deliver very, very time-sensitive materials, including unlimited proxies, which, quite frankly, is the issue in this case. What happened is, Your Honor, is that they did not enter into a final written agreement. Would I have liked them to do so? Of course. But in the end, what they did, they did understanding exactly what their obligations were. They were tested by the company, Broadridge, to make sure that they could comply. They understood that this was not just delivering whenever we get to it and it'll be fine. It was something that had to be in a timely manner. You seem to pay a lot of attention to the fact that they were tested. I understand. I think you've explained it very well that there was a practice run that was done and that it worked out well. But other than that, what significance does that have? Well, I think what it is, Your Honor, it builds. It tells the context of the relationship between these parties and the understanding. What was foreseeable? What did they know their obligations to be and what did they know could be the consequences of a failure to comply with those obligations? So basically that. So again, I'd like to build up through the chronology because then they took over and were delivering the way they should have for a decent period of time, demonstrating exactly what the parties had agreed to do, namely deliver these materials in a timely manner, which we say was at least one to two days after it was received. And generally they did just that until this instance, until this instance. And the fact is, Your Honor, it can't be lost on the fact that they apologized. They didn't say in their apologies, you know, we had no obligation to really deliver them at any particular time, but we would rather have them gotten out early. They knew what they did. And that was part of the whole story. So the question is, OK, so what damages flow from this and what can be recovered under the circumstances? Now we have lost profits and let's deal with it first. We have a difference of opinion, obviously, and that's why we're here on appeal as to what that means. Are they too speculative? Were they perceivable? In the end, we have submitted to the court case law that I think demonstrates that for the purposes of our pleading, that we have given enough facts to demonstrate that they were foreseeable or should have been foreseeable based on the circumstances. And in terms of their speculation, look, we're claiming damages based upon a loss of a customer that we had for many, many years. It'll be up to the court at some subsequent proceeding to determine, OK, what's the extent? What's the extent? Could we could we get 20 years worth of damage? Maybe that's too speculative. But if we demonstrate an over 10 year relationship at over a million dollars a year on this bound printed material is something else and something else in the cards for the purpose of what's reasonable under the circumstances. And really, we never get that chance because the court comes to the conclusion right off the bat. It's just too speculative. And of course, the argument is lost profits are just not something that are are guaranteed. Of course, they are not guaranteed. The question is, do we plead enough facts to demonstrate the relationship between these parties, make it potentially more likely than not that that it was foreseeable and that we should have an opportunity to go through the type of discovery necessary to to to dig into what they knew when they knew it, what their anticipation was, what they do for other customers in the same type of business, because OSM does a lot of work in this business. They know what they do. You have case law to support that under the contractual situation that you have requires a contractual whatever you label you want to put. It's not express, correct? It's not express. No, it's a quasi contractual relationship based upon conduct and based upon the implied contract, in fact, law in connection with their underlying activities on behalf of my client. And I have cited case law within the context of the brief that talks to lost profits and deals with this is a could be considered a common loss that ultimately, ultimately should be at least at the at the pleading stage considered, explored through discovery in order to determine ultimately what is foreseeable, what is speculative, what is reasonable under the circumstances. And we don't get that chance. It is not simply no lost profits. It's always too speculative. We know that's not the case. That's far too overbroad. And what and what and what OSM tends to do is they take some outlying cases. And of course, there's a lot of cases out there. They say a lot of different things. The question is, which ones are more persuasive at the end of the day, whether or not the whether or not the authority on one side outweighs the other. We're we are believe is based upon the case where we started our brief. These are the type of lost profits that can be acted on, that can be sought. And ultimately, it'll be a question that we dealt with on a summary judgment level and or a trial. That's really what happened here. Excuse me, counsel, but when we talk about lost profits, we're talking about the loss has to be proved with reasonable certainty. Correct. And the and the breach has to be plainly traceable to a specific portion of lost profits. Is that what you've alleged? Well, I think I think we have, Your Honor, because what we've done is we said, look, what you guys had to do, you failed to do, you acknowledge that you failed to do it. And it had a direct result in us losing a customer that we have service for over 10 years. And it is reasonable under the circumstances, because I think it comes within the realm of ultimately what's going to be reasonable. I think, you know, I think in terms of our pleading, we establish a level of reasonableness. The question is, is this decision as to whether or not it's reasonable going to be determined now at the pleading stage in a motion to dismiss or whether or not through discovery or otherwise, it'll be flushed out to the point where the parties can place it before the court again. That's all we wanted was to get moving on this, to examine it, to study it, to get the discovery necessary. And I think that the pleading that we have makes the grade. So let's go back to that. I'm sorry, Justice Anderson, go ahead. I just had one follow up question. I'm sorry. Thank you. So when you state that you were happy with your first complaint, the trial judge wasn't. You're telling us that the trial judge wanted you to plead more. Can you help me understand what the more was that the trial wanted and what more did you give? Well, the court in terms of the first decision, it was on the record. There wasn't a lot of detail in terms of, you know, exactly what needed to be pledged. So what we did is and it's on page 20 of my complaint, we included additional allegations that that that flushed out the relationship, the historical relationship, what the anticipation and the expectations of the parties were in various paragraphs. And we believe that adding what we did, although we had, again, and it's respectful, the court is the court makes a decision. And once more, we had a right. We decided to do that. We added we added additional allegations that that I think buttressed our claim to the point of the court satisfaction. Obviously, that was not the case. But we did include additional paragraphs to talk about the relationship to the parties, the understanding between the parties, the agreement between the parties. Do I have a provision that says that the parties agree that if they lose a customer as a result of this, that they'll be responsible for it? No, I don't. And I understand that fully. But what I do have is case law that says, wait a minute, that could be a direct loss if it's a direct result of the breach. It's within the realm of possibility that loss of a customer's business would, in fact, be recoverable as lost profit. So, Your Honor, in the end, I do believe that we gave the we gave the court more than enough at the pleading stage under the rules of the Illinois courts as to what needed to be done here. That's my view. Thank you, Counsel. In the order that Judge Kappas finally entered when he talked about the voluntary payment doctrine that you could you address that, if you would, please? Yeah. The concept is this. Look, one thing to settlement is a settlement. And it's it's their sacrosanct. Okay. And settlements that are only obtained through coercion or whatever, and a lot of other factors, you know, they have they can be subject to collateral attack. The thing is, this was a settlement of sorts. It had a unique characteristic in it that I think the judge didn't focus on as much as I would have liked him to. And that is, look, all the parties reserve their rights because the history of that proceeding was, all right, we're in state court. Let's see what happens. Well, you know, we'll pay this amount. Okay. Voluntary. Of course, it wasn't coercion. I'm not arguing that at all. It was voluntary, but within the context of a document that specifically said the parties reserve all rights. And that reservation of rights included, but not limited to our right to bring a separate action because it was anticipated by the very language that, in fact, if we bring an action, it's going to have to be brought in state court or federal court, and the depositions will be done remotely. Everyone knew that was the case. And I think it's not only I think it's not only implicitly clear, it's explicitly clear in the document itself that, yes, a payment was made, but it was not subject to a general release between the parties for a reason, because neither of the parties understood we were resolving it. Quite frankly, consideration was they didn't have to collect any more attorney's fees or pursue it any further or us to assert counterclaims within the context of that provision, giving us the right if we so choose or desired to bring the action at another time. Everyone understood and anticipated that. So that's why the voluntary issue with because, yes, it was voluntary. Yes, a payment was made. But the doctrine itself is for those situations where people are resolving their differences so that they don't go back to court and waste the court's time on arguing over things that they already agreed to. In this instance, it was not an agreement that settled the case completely. It was not a general release to the other side and nor to from us to them or them to us. And it's typically understood the possibility that we could bring a separate action for the claims that we originally made, which were reserved for future date. And that's where we were and found ourselves after the federal court situation, which we explained in our brief, found ourself before the Illinois courts. Thank you. Dr. Cheek, you can proceed if you have any more. Thank you. Thank you. In terms of that deals with the payment that was made, it. Reserve the seventy eight thousand dollars, but the big issues here and again, not to diminish any one of them, but look, we have a situation where we lost a customer. We have a situation and we cited some case law that this would be potentially a direct loss in terms of the attorney's fees that we had to pay. We had no choice based upon the facts and circumstances of the matter. We were essentially, if not the last man standing, the second and last man standing. And ultimately, our rights would be against a third party. That's the action that we have today. The fact is, is that these two types of these two types of damages, I think that I think that and I believe respectfully that that the court in a way and again, total with respect, jump the gun because we have given those facts necessary to keep this complaint alive. It doesn't resolve it on the merits. We're not looking we're not looking to pursue a frivolous case. We have things that are supported by Illinois case law, which we cited in our brief. They found some different cases. We found some different cases. The appellate court will make a determination which cases are more persuasive under the circumstances, which accurately state the state of the law in the state of Illinois. Our position is, is that both of those measure of damages are absolutely recoverable based upon the allegations we pled in the complaint. Whether or not we will win at the end of the day is another story. But that's for the next day. And we want to get to the next day because I think justice requires that we have an opportunity to seek to seek relief from a party that did not do what it was supposed to do, even though we didn't have an express contract with the dies audit and the keys crossed. That's exactly what to be done. This business, they knew exactly what they were doing. And again, I always go back to their apology. One could say they were simply trying to do it for the purpose of customer service. But you know what? The way it was done acknowledged from my standpoint, what I would argue an admission. And I have a question. Mr. Miller, I have a question. The trial run that was done. Right. Were there costs that were incurred by the company for the trial run production of the documents? I can't. Shipping costs. I do not know. I can't. I apologize. I do not know the answer to that. Was something paid for that to produce the documents to send them to the company to ship them postage, etc. Not alleged to my complaint. And quite frank, when I made a complaint, and quite frankly, I don't know it was what you're frozen, Mr. Millicent on based upon an agreement that will give it a test run with no costs. I don't know. So no one made any claim against you for payment, nor did you make any claim against them for payment to your knowledge? Oh, nothing in connection with the trial run. No, the relationship went on. There was some money that was due on prior deliveries over the course of the relationship that became part of the settlement amount that was paid. But in terms of that trial run, I have no information whatsoever that there was any dispute whatsoever concerning any cost or expense associated with it. All I Mr. Millicent, after the trial judge dismissed the case or on the day the trial judge dismissed the case, did you again try to seek repleting? No, Your Honor. Under the circumstances, under the circuit, we did not ask to replete again. I think I think we have to be realistic. I think we we made sure at least we hope that we made sure that when we did the amended complaint, we would include as much as we possibly could concerning the relationship necessary to satisfy the Illinois rules of the court and statutes insofar as pleading is concerned. So no, we did not. Okay. Judge, is there any other questions? No. No, thank you. I'll say one question before we turn it over to Mr. Morales-Doyle. And that is you said the case law breaks both way here in Illinois, which which case do you want us to focus on? What's what's your strongest argument that this type of contractual situation or this type of relationship allows you to have these kind of damages? Your Honor, we cite one case is Schleppel versus Arkansas Best Freight Systems, 117 Illinois Appellate Second, 65th Circuit, 1969. And then on page eight on page eight of our brief, we list the cases that we think are comparable under the circumstances on a motion to dismiss situation insofar as lost profits is concerned. So we have many cases in there, Your Honor, but I but I think that's part of it and something that's important to note. Thank you, Mr. Millis. I'm going to turn it over to, and you'll have five minutes in rebuttal, Mr. Millis, after Mr. Morales-Doyle has this opportunity. Mr. Morales-Doyle, whenever you're ready. Excuse me. Good morning, Your Honors. May it please the court. Patrick Morales-Doyle on behalf of One Stop Mailing LLC. And I'll refer to my client as OSM probably, and to the other party as GRD, as we did in the briefs. Just to be clear up front, what we're asking the court to do on GRD's appeal of the dismissal of their amended complaint, we're asking the court to affirm, and the court should affirm for three reasons. One, GRD failed to plead any legally cognizable damages under Illinois law. Alternatively, GRD also failed to plead sufficient facts to establish a meeting of the minds on the implied contract term they claim was breached. And third, I think dismissal, affirmance by way of dismissal of the appeal would be justified based on GRD's violations of the Supreme Court rules in its briefing. On the cross appeal, we asked the court to reverse the circuit court's denial of OSM's cost and fee petition because this is litigation to enforce the settlement agreement, and it involves a claim arising under the settlement agreement. And therefore, the fee shifting provision in the party settlement agreement allows OSM to obtain its reasonable fees and costs under the fee shifting provision. I'll address what counsel raised and go through the specific issues. But just from the outset, this is a case that should have ended before it ever began. In December 2020, GRD hired OSM to deliver certain bound printed material. That's what we call the December 2020 delivery. It was without any written contract, as counsel said, without even an express oral contract. And because there was undisputedly no express contract at all, there's no express term as to the timing of when the delivery was supposed to be completed, let alone any express terms concerning lost profits, attorney's fees, or indemnification. OSM completed the December 2020 delivery, apparently without incident. After the fact, in early 2021, GRD complained that the delivery should have been delivered more quickly. Now, in late 2020, they complained that it should have been delivered more quickly. And understandably, OSM apologized to its customer, trying to keep its customer happy, and said it would do better in the future. But still, OSM didn't concede that it had breached anything. And OSM billed GRD timely for the December 2020 delivery and other deliveries it had performed for GRD. And GRD failed to pay the invoice. So, a year later, in late December 2021, OSM had to sue GRD to get paid for this delivery and other deliveries. And... What other deliveries? There were a number of other deliveries. As counsel indicated, GRD had, or OSM had performed various deliveries for GRD over the course of time. And... I mean, after the December 2020, before the December 2021 one that you indicated. The December 2021 was not a delivery. That was when... The suit was filed, I understand, but you said for other deliveries. I don't know if all of the other deliveries that were sued upon were before or after. I believe some of them may have been after the December 2020 delivery, just based on when the invoices were issued. I'm not exactly sure on the timing. They were all, I believe, in relatively the same time period. Because these are invoices, I think, from January to March 2021. Was the first one that was in dispute made, was that the one in December of 2020? Or was there one prior to that, that there had been some dispute about? I think that's the only one there is any dispute about.  Yeah, the only one at issue in this case, and the only one I'm aware of, of there being a dispute is the December 2020, what we call the December 2020 delivery. Counselor, refreshing my memory, they did pay something for that, right? After we sued. Yeah, that's what the settlement is. So that's why I say this is a case that should have ended before it began. Okay. All right. I was thinking about the damages, but go ahead. Yeah. So OSM had to sue to get paid on its invoices. GRD, at that time, instead of continuing to defend that lawsuit, GRD decided to settle the lawsuit and paid OSM for the December 2020 delivery and the other deliveries for a sum certain. That's where the case should have ended. That's at least six months before this litigation actually began. This dispute should have ended with that settlement. If GRD wanted to get into one of the three buckets of damages they're claiming, one of the buckets of damages they're claiming is the settlement payment itself. A settlement payment is not damages. That's what they paid to resolve that lawsuit. Considering that they couldn't enter into a contract that requires them to pay you the money, that you are asking for, and reserve their right to sue you in the future. That's your position. No, that is not my position, Your Honor. They reserved their claims. I don't dispute that there is... And what are the claims for? To compensate them in what way? They could claim that we breached and they could sue for damages. But what isn't damages, the question is not whether or not on this issue is not whether or not they can state a claim for breach on the other elements. Aren't you arguing that they settled so they can't renege on their settlement? They can't go back on their settlement. Even though their settlement says that they can sue you. They can't claw back the settlement payment itself. Where does it say that in the settlement? Well, it says that, one, it's the voluntary payment doctrine. Two, the language of the settlement agreement itself says in any future litigation, GRD will be credited with that payment. So you can't be credited with the payment and then also claim the payment back. Understandable. My apologies, counsel. I realize that they'll be credited for what they paid you. But if they paid you something that they didn't owe you, if that was a result of the litigation, I don't understand why they couldn't reserve their right to pay you to stop the litigation that was going on at that time and then take it up on their debt. Well, for a number of reasons. One is the voluntary payment doctrine does not allow that. If they voluntarily paid, in the first instance, it's not damages. It's not damages they suffered based on an alleged breach. It's a payment they chose to make to end the lawsuit. They negotiated between lawyers, that's some certain. They haven't cited a single case that says, yeah, you can actually call back a settlement payment as damages from the party. Have you cited a single case on the voluntary payment doctrine that also had an agreement which reserved the right to sue? I don't know that we've cited one that had that reserves an agreement to write sue. But there are cases that we cited and that making a payment at the threat of litigation is not duress. That does not qualify, nor did they agree with that protest. But do any of those cases actually have an agreement, not just the threat of litigation, but an agreement between the parties in consideration? I'm not sure. I'm not sure. I can't recall a case offhand that involves an agreement like that. No. But to me, the fact that there is an agreement makes it all the more clear that it's not voluntary. In the absence of agreement, they could at least argue, we paid this under duress. We were afraid they're going to do this, that, and the third to us. They instead paid pursuant to agreement that specifically says, we're entering into this agreement voluntarily. So I think the fact of the agreement takes it completely out of the realm of an exception to the voluntary payment doctrine. They did not pay under protest. That's their main argument for why this should count as duress, is that we paid under protest. But all the cases they cite, almost all the protest cases, involve disputes between a party and payments made to the government. And they're usually tax cases. Isn't that where the doctrine came from? Yeah. Yeah. I think that is where the voluntary payment doctrine generally comes from, is that you're under some duress to pay something. So it usually arises in a couple of different contexts. One, you're under duress because the gas company is going to shut off my gas unless I pay now. And I'm going to pay under protest and reserve my right to contest those charges. But I need to pay to keep the heat on. The other is when the government's demanding money, because the government, of course, can coerce money from people. And so that's why there's a statute in their tax code in Illinois that says, yeah, if you pay under protest, you can still contest the taxes you paid given this. That is not the situation here. They paid to make that claim go away. And now they're trying to claw it back. But why would there be language? Why would there be language in this agreement then that talks about reservation? So that they could pursue the claim in this case for the other buckets of damages. Now, those buckets of damages fail as a matter of law as well. But that's why the parties were reserved. But from the settlement agreement's perspective, the settlement agreement didn't carve out those particular rights. It just said reserve rights. Right. OK. OK. Right. Correct. Correct. Both parties reserve their rights. If it worked for the settlement agreement, let's say hypothetically that didn't exist. Do you have defenses to damages relating to payments made to your client? The voluntary payment doctrine would still would still bar the claim. They just they paid us and they can't then pay us with knowledge of the dispute and then claim it back. There's no power that OSM held over GRD that would have made it under duress. They voluntarily paid. If we if you the cases that we discuss in it in our brief, they talk about why why the voluntary payment doctrine is there. And it's so that if they wanted to dispute that payment, the time to do it was in that lawsuit. Instead, they settled the lawsuit. Now, it doesn't mean that they couldn't claim some other bucket of damage somewhere else, but they can't try to claw back that settlement payment in a new lawsuit. We drafted a settlement agreement. I think both parties negotiated it between their counsel. This is it would completely undermine the public policy in Illinois in favor of settlement agreements if parties could enter into them and then claw back the settlement payments they made just because there's not an express release of claims. It would lead to what we have here, which is ongoing, never ending litigation over things. If they wanted to dispute that, the time to do that was in that lawsuit. They elected not to. It doesn't necessarily bother other claims of damages, but those fail for other reasons that I can touch on. If the settlement agreement expressly reserves their rights and we disregard that, are we not violating public policy as it relates to enforcing settlement agreements? Not at all. It doesn't expressly reserve their right to claw back the settlement payment. It reserves both parties any claims that they have. It doesn't allow them to undermine the voluntary payment doctrine. The voluntary payment doctrine doesn't have an exception. There's no cases that it recognizes an exception for contracted for payments. In fact, a contract itself by nature is voluntary. If you're paying pursuant to that contract to settle the claim, then it can't be involuntary. Even counsel said settlement agreements are sacrosanct. They said, of course, the payment was voluntary. What he's tried to say is, well, there's not usually this situation where somebody pays, but then they want to dispute the claim later. That's always where the voluntary payment doctrine comes up. Somebody makes a payment, and then they come back after the fact and say, actually, I want to contest that payment. But that's why the party settled that claim and made that payment. Quickly, I'd like to get to the other issues if I have time. What they describe as lost profits is not really lost profits, and I think counsel described it today more accurately. It's a claim of a loss of a customer. That's not what the lost profit cases address. There are no facts alleged that would support that claim for damages under Illinois law. What I want to make clear is what is and what's not at issue on those alleged lost profits damages. GRD is not seeking profits that it claims it would have earned on the December 2020 delivery. It's not part of this transaction. Second, it's not claiming damages that it would have earned on collateral transactions. It says these are collateral transactions, but they're not. The cases that deal with collateral transactions like the Fluge versus Kraft Manufacturing Company case, that was their contract for a die that would have allowed the claimant to then produce other things, manufacture other goods. That was collateral because if you had given us this, we would have been able to fill this other contract. Or in the Mandel case, it's if you would have sold us the I would have been able to renovate it and flip it. Those are collateral transactions. Those are not what GRD is claiming here. GRD is just saying, hey, our customer did not hire us for future contracts, future unrelated deliveries, and we think they should have kept hiring us, and we're going to blame you for that. There are no cases that they cite that support such an attenuated claim for damages. That's not a collateral transaction at all. But even if it were, there's no allegations in the complaint to support the idea that OSM reasonably contemplated that they would be on the hook for such damages, let alone agreed to them. Mr. Morales, I realize we batted you with questions on one particular, so if you'd please wrap up fairly quickly. Yes, Your Honor. The attorney's fees claim also fails. I think our brief addresses that pretty comprehensively. They're seeking attorney's fees from three levels of removal, three levels of separation from OSM. It's not attorney's fees they incurred or their client incurred. It's their client's client's attorney's fees. That does not fall into the limited third-party suit exception to the American rule, and there's no facts they plead that could bring that into that limited exception to the American rule. We also think that they haven't alleged sufficient facts to establish the meeting of the minds on that term. I will leave for my rebuttal our claim on the fee and cost petition, if that's all right with Your Honors, given the time. I appreciate that, Mr. Morales-Doyle. Before I ask my colleagues, when you come back for your last five minutes, if you can distinguish the shuffle versus ABF case that we talked about. I assume you're familiar with it when we come back, though. Judges, any other questions? No. No, thank you. At this time, Mr. Millis, you have five minutes in rebuttal. We'll do it very quickly, Your Honor, if you wish. Thank you. In terms of the first two points, GRD failed to plead illegal and cognizable damages, and there's no meeting of minds on those damages. In any case where a motion to dismiss is made, whether it's in New York or Illinois, we know that you don't have to prove your case at that point. You have to submit sufficient facts in order to establish what is required under the rules of the court in that particular jurisdiction. I say this. Based upon what we did, it's like a mathematical formula. Did we include the variables necessary to establish the formula for the purpose of satisfying the pleading standard? All I'm going to say is I believe we did. I've included all the paragraphs. Your Honor has seen the complaint. You've seen what we've argued. Is it going to be enough? That'll be your determination. In terms of, though, let me get to one point that was made. This is a case that should have ended before it began. That was what counsel started off with. Now, although later on he acknowledges the fact that there was a GRD, they purposely give you half a loaf insofar as the argument is concerned. Your Honor has pointed out and found that and know that there was a reservation of rights. It was a contract, that agreement. Words are given meanings in any contract in any jurisdiction. The fact is that the decision that was made to resolve that case was made on a lot of reasons, and they could have said, no, sir, we're going to get our money. I'm not going to allow you to reserve your rights. You've got to give me a full release, and maybe I'll give you another discount. They didn't do that. They took their full money, and then they acknowledged the fact that something could happen in the future. They knew it. They hoped it wouldn't happen. It did, but we had a right to do it. And insofar as their attorney's fees, we're not trying to enforce the settlement agreement. Remember, the settlement agreement is made that they're going to be paid $178,000. Every settlement agreement in the world says, hey, if you don't pay, there's going to be penalties, sometimes attorney's fees, sometimes interest, whatever it may be. We paid. We paid. There is no attempt here to enforce that agreement against us for our breach of the terms of that agreement, none whatsoever. And the fact that they were paid means that they're not trying to enforce the agreement. They're not entitled to attorney's fees. Look, Your Honor, in the end, outside another case on the attorney's fees issue, Ritter v. Ritter, 381 Illinois 549, 1943. And in that case, it stated, where the wrongful act of a defendant involved the plaintiff in litigation with third parties or placed him in such relation with others as to make it necessary to incur expense to protect his interest, the plaintiff can then recover damages against such wrongdoer measured by the reasonable expenses of litigation, including attorney's fees. Just one case. And again, they're in there, Your Honor. We're not here to read the whole brief. I'm just saying that, basically, we gave the court enough. We respectfully believe that. And that will be what Your Honor's will determine. And in terms of all of that, that includes every single one of our measure of damages could fall within that rubric, not only of the complaint itself, but also the agreement that was made between the parties, which clearly anticipated that we had a problem with everything that we were doing, but we were going to pay you. And money in the hand is worth two in the bush, and we gave it to them. With every right to go after them again to say, guys, you did the wrong thing, and we're going to bring another action. And you know we are, because you anticipated by virtue of the language of the contract that you signed. Your Honor, I'll leave it with that. But thank you. Thank you, Mr. Millis. Judge Anderson? No questions. Thank you. Justice Tavenport? No. All right. Thank you, Mr. Millis. And if the clerk can start the clock again, we'll hand it back over to Mr. Morales-Doyle. Thank you, Your Honors. So quickly, I think you asked me about the Sheple case. The Sheple case denied the claim for lost profits. And so I think it doesn't support plaintiff's position. But it also actually shows, again, this sort of illustration, the difference between what plaintiffs are claiming here and what these lost profits cases actually typically deal with, which are actually either profits on the transaction in question, or at least on a collateral transaction. And as we said in our brief, all the cases they cite where there were actually damages allowed, they're actually on the transaction itself. And that's not what's being claimed here. The ones that deal with collateral transactions, they're all denying the damages. And in Sheple, it was a question of a delivery of furniture. And there was a delay. And when it became delivered or was to be delivered, it was rejected. And the claim, I believe, on the lost profits was, hey, we're going to take that and then resell that furniture to someone else. And we expected to receive X dollars on that resale of the furniture that you were supposed to deliver. And the court said, no, the parties didn't reasonably contemplate that they would be on the hook for your resale damages of that furniture. Now, think about how much of a closer nexus that is than what we have here, which is essentially a claim that, hey, because you agreed to make this delivery for us, you're on the hook for ensuring our ongoing business relationship with this third party continues at the same level we say it's been at for years into the future. That's not a collateral transaction. That's a loss of business opportunity. And like the Feldstein case we cite in our brief, loss of a business opportunity. And accepting to make this delivery for which they got paid less than $70,000 was contemplating agreeing to be on the hook to ensure their ongoing business relationship with a third party to the tune of over $4 million. That's 50 times the amount they got paid for making this delivery, notwithstanding the cost of actually performing the contract. So I think it's absurd, the idea that OSM reasonably contemplated that. To switch gears to the cross-appeal, I think it's just telling. Counsel is trying to claim attorney's fees that were not incurred by GRD or GRD's client Broadridge, but by GRD's client's client, and trying to shoehorn that into this limited exception to the American rule. The difference between that and the cross-appeal is stark. If this was such an important delivery, they would have entered into a written agreement or at least an express agreement. We all do this every day. We say two day shipping, three to five day shipping, overnight mail. They didn't do that here. And they certainly didn't agree to a fee shifting provision. In contrast, when the parties settled OSM's lawsuit, they agreed as a way to, of course, discourage trying to go back on what they agreed to in the agreement, and to discourage claims arising under the agreement, to enforce the agreement. They agreed to a fee shifting provision. And that fee shifting provision is not limited to claims in lawsuits for breach of contract. Instead, it applies to any claim, any litigation to enforce the agreement. Now, I think it's quite clear that GRD sought to enforce the agreement and brought a claim arising under the agreement because that payment that they're trying to claw back wouldn't have existed except for the settlement agreement, wouldn't have been made except for the settlement agreement. And they attached the settlement agreement to their complaint to try to enforce that reservation clause. They're still asking this court to enforce the settlement agreement. Additionally, OSM is seeking to enforce the settlement agreement, and did so successfully through the voluntary payment doctrine. And in the court below, the circuit court expressly relied upon the settlement agreement in denying, in recognizing OSM's defenses and denying GRD's claims. So, I think this is litigation to enforce the settlement agreement. It's not limited to a claim for breach. And because of that, and because OSM is the prevailing party, OSM's entitled to recover its fees and costs. And so, that portion of the ruling below should be reversed, and the case should be remanded for an award of fees and costs. Thank you, Mr. Morello-Stoyle. Justice Davenport? Nothing further. Thank you. Justice Anderson? Nothing. Thank you. Gentlemen, thank you very much. I appreciate the spirited debate and appreciate you answering our questions the best that you can. You have a good day. We are going to take this case under advisement and issue a ruling in due course. Thank you, Your Honor. I very much appreciate it. Thank you. Thank you, Your Honors. Thank you, counsel. Thanks, counsel.